**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 15-cv-00106-REB-KLM

HUNTER DOUGLAS INC.,

      Plaintiff,

v.

GREAT LAKE WOODS, INC. and
WATERS EDGE BLINDS AND WINDOW TREATMENTS, LLC,

      Defendants.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS**

---

**Blackburn, J.**

      This matter came before me for a trial to the court on October 22, 2018. The

plaintiff asserts in its complaint [#1][1] claims for direct patent infringement and active

inducement of patent infringement. The patent at issue is U.S. Patent No. 8,485,242

('242 Patent) which is owned by the plaintiff. The defendants assert counterclaims for a

declaration of non-infringement and a declaration that the '242 patent is invalid. The

claims of the plaintiff and the defendants were as preserved in the **Final Pretrial Order**

[#84].

## INTRODUCTION

      The plaintiff, Hunter Douglas, Inc. (Hunter Douglas), filed this patent infringement

action against the defendants, Great Lake Woods, Inc. (Great Lake) and Waters Edge

---

[1] "[#1]" is an example of the convention I use to identify the docket number assigned to a
specific paper by the court's case management and electronic case filing system (CM/ECF). I use this
convention throughout this order.

Blinds and Window Treatments, LLC (Waters Edge) to stop the defendants from making, using, selling and offering for sale blinds that infringe the claims of the '242 Patent. The patent is titled "Selective Tilting for Blinds Including Driven Drums." The '242 Patent reflects a new and improved window covering that allows the slats to nest together in pairs and provide twice the view of a standard blind in an open position while also allowing the slats to tilt from fully closed in one direction to fully closed in another direction. This novel blind was a significant improvement over the prior art. The blind is claimed in asserted claims 12-15 and 17 of the '242 Patent. Hunter Douglas seeks a permanent injunction against infringement by the defendants and an award of attorney fees.

On October 22, 2018, this matter came before me for trial on the conflicting claims. The evidence at trial establishes that shortly after entering the window blind field, the defendants manufactured and sold their Doubleview Blind product. The Doubleview Blind is a blind product which also provides twice the view of a standard blind in an open position and allows the slats to tilt from fully closed in one direction to fully closed in another direction. Even after this lawsuit was filed, the defendants wanted to continue selling their Doubleview Blind product. The evidence establishes that the Doubleview Blind product infringes the '242 Patent owned by Hunter Douglas.

The defendants argue that the asserted claims are not enabled because the specification uses the word "cable" and the claims use the word "cord." This argument ignores that the defendants did not seek construction of that term. Moreover, the explicit disclosure and teachings of the '242 Patent explain that "cord" and "cable" "are sometimes used interchangeably in this specification" and that the '242 Patent "will sometimes refer to the tilt cables when we mean the entire associated ladder tape

including both the front and rear tilt cables . . . and this usage will be obvious within the context in which it used". [Trial Ex. 1 at 2:30- 32 and 9:65-10:3]. Use of the terms "cord" and "cable" in the '242 Patent is further consistent with how those terms are understood by Hunter Douglas and those of ordinary skill in the art. [Trial Tr. 39:22-25, 40:20 - 41:9, 49:8-12].

The defendants repeat their argument that the claims of the '242 Patent are limited to certain disclosed specific drum mechanisms. The defendants focus on the figures depicting the exemplary embodiments, arguing that because specific mechanisms for manipulating the ladder tapes are disclosed, the Doubleview Blind product must fall outside of the claims. This argument ignores the order [#65] construing disputed patent claim terms. Further, this argument ignores controlling law, which provides that it is impermissible to import limitations from the specification into the claims.

Having judicially noticed all relevant adjudicative facts in the file and record of this case pro tanto; having considered the stipulations of the parties; having considered the evidence educed at trial in its various forms; having determined the credibility of the witnesses; having weighed the evidence; having considered all reasons stated, arguments advanced, and the authorities cited by the parties in written and oral form; and being otherwise sufficiently advised, the court enters the following findings of fact established by a preponderance of the evidence, conclusions of law, orders, and judgment.[2]

---

[2] Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be as more properly characterized.

## JURISDICTION & CONTROLLING LAW

This court has jurisdiction over this case under 35 U.S.C. §§ 1 et seq. (Patent Act), as well as 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338 (patent infringement).

## FINDINGS OF FACT

The defendants stipulated to essentially all of the facts relevant to this case. These findings are based on the stipulated facts stated by the parties in the Final Pretrial Order [#84] entered October 4, 2018, and the exhibits and testimony received at trial on October 22, 2018.

### I. The Parties and Industry Overview

1. The plaintiff, Hunter Douglas, Inc., is a Delaware corporation with its principal place of business in Pearl River, New York. [Trial Ex. 62].

2. Hunter Douglas is a leader in the window covering industry with innovative new and proprietary window covering products. [Trial Exs. 1-2; Trial Tr. 21:8-13, 22:4-23:6]. Hunter Douglas holds many window-covering patents and other intellectual property rights. [Trial Tr. 25:2-15]. Hunter Douglas sells its window covering products to distributors in the industry. [Trial Tr. 25:16-19]. Among other products, Hunter Douglas sells a variety of horizontal and vertical blinds, in various materials (wood and fabric) and sizes. [Trial Ex. 82; Trial Tr. 23:7-10, 24:3-5, 25:11-15, and 32:22 - 34:25].

3. Defendant, Great Lake Woods, Inc., is a Michigan corporation with its principal place of business in Holland, Michigan. [Trial Ex. 63]. Defendant, Waters Edge Blinds and Window Treatments, LLC, is a Michigan Limited Liability Company with its principal place of business in Holland, Michigan. [Trial Ex. 64]. Great Lake has 100

employees and is the parent, manager, and affiliate of Waters Edge. [Trial Ex. 63 and Trial Ex. 71 at 9:22-23]. Waters Edge is a wholly owned subsidiary of Great Lake. [Trial Ex. 71 at 6:17-18]. Keith Malmstadt is the President of Great Lake Woods; he owns 85 per cent of the company; and he has been with the company for more than 25 years. [Trial Ex. 71 at 4:8-11, 4:12-13, and 6:15-16]. With the exception of accounting functions, Great Lake and Waters Edge are treated as one company sharing offices. No corporate agreements or documents between Great Lake and Waters Edge exist. [Trial Ex. 71 at 8:21-25, 9:1-5, and 154:5-14].

4.  Historically, Great Lake was in the business of manufacturing moldings and millwork for cabinets. [Trial Ex. 71 at 9:19-21 and 10:9-12]. However, Mr. Malmstadt wanted to get into the window treatment industry and created Waters Edge in 2012 to manufacture and distribute window treatment blinds. [Trial Ex. 71 at 10:1-3 and 11:1-3]. Mr. Malmstadt found that it was relatively easy to get into the window covering industry as there were no significant overhead costs and he was readily able to purchase or manufacture component parts and assemble its window covering products. [Trial Ex. 71 at 46:1-16 and 39:6-21].

5.  Waters Edge manufacturers one, two, and two and half inch horizontal blinds, in both wood and faux wood, as well as vertical blinds. [Trial Ex. 71 at 11:4-8]. Waters Edge sells its window covering products to its customers who are distributors in the industry. [Trial Ex. 71 at 11:9-10].

## II.  Hunter Douglas Invents and Patents
## the Inventions Claimed in the '242  Patent

6.  Donald Fraser and his supervisor, Richard Anderson, in their positions with Hunter Douglas, invented a new and improved blind that allows the slats to nest

together and provide twice the view of a traditional blind in an open position while also allowing the slats to tilt from fully closed in one direction to fully closed in the other direction. [Trial Ex. 2; Trial Tr. 25:20 - 26:17, 28:14-29:1].

7. For this invention, Hunter Douglas was granted U.S. Patent No. 8,485,242 (the '242 Patent) entitled "Selective Tilting for Blinds Including Driven Drums" by the Commissioner for Patents with the United States Patent and Trademark Office. [Trial Exs. 1 and 65].

8. Mr. Fraser and Mr. Anderson assigned their right and interest in and to the invention to their employer, Hunter Douglas, and that assignment is recorded at the United States Patent and Trademark Office. [Trial Ex. 2]. Thus, Hunter Douglas owns all rights in and to the '242 Patent. [Trial. Ex. 66].

9. The '242 Patent describes a number of key innovations in the window treatment field - innovations that make the Hunter Douglas product more versatile and customizable in terms of privacy, glare elimination, and light control. [Trial Ex. 1; Trial Tr. 27:14 - 28:13].

10. The relevant asserted inventions of the '242 Patent generally relate to blinds capable of different open or closed configurations, including a double pitch configuration. A double pitch configuration is highly desirable because it allows more light through the blind and an increased unhindered viewing area. [Trial Ex. 1 at 1:33-35; Trial Tr. 27:14 - 28:13]. The features, configurations, functions, operability, and exemplary embodiments of the inventions are described in detail in the '242 Patent. [Id.].

11. Figure 1 of the '242 Patent discloses a blind 10 that "includes a head rail 12 and a plurality of slats 14 suspended from the head rail 12 by means of tilt cables 16

and their associated cross cords 16t (see FIG. 20), which together comprise the ladder tapes." [Trial Ex. 1 at 5:34-37; Trial Tr. 29:5 - 30:11, 35:5 - 36:22]. Moreover, "[l]ift cords 20 are fastened at the bottom of the bottom slat (or bottom rail) 18" and that "[t]ilt cords 24 operate a cord titer 26, which is used to rotate a tilt rod 28 about its longitudinal axis in order to actuate the tilt stations 30." [Trial Ex. 1 at 5:37-45; Trial Tr. 30:12-25].

12. The specification further discloses that "16 is the generic designation for tilt cables . . . the suffix "a" is used for the first set and "b" is used for the second set of tilt cables . . . [and] the additional suffix "f" or "r" is used to indicate front (room side) or rear (wall side or window side). [Trial Ex. 1 at 5:45-52; Trial Tr. 31:22-25, 32:9-21].

13. Figure 20 of the '242 Patent discloses that "[t]he top slat 14t of each pair of top and bottom slats 14t, 14b is supported by a cross cord 16t extending between the first set of front and rear tilt cables 16af, 16ar." [Trial Exs. 1 at 9:63-65 and 83 at 10-15; Trial Tr. 46:3-25]. For convention, the '242 Patent discloses that "a" is for the first set of tilt cables, "b" is for the second set of tilt cables" (supporting the top "t" or bottom "b" slats in each pair of top and bottom slats), "f" is for the front tilt cables and "r" is for the rear tilt cables. [Trial Exs. 1 at 9:16-28 and 83 at 10-15; Trial Tr. 46:3-25].

14. Importantly, the '242 Patent explains that "cord" and "cable" "are sometimes used interchangeably in this specification" and that the '242 Patent "will sometimes refer to the tilt cables when we mean the entire associated ladder tape including both the front and rear tilt cables . . . and this usage will be obvious within the context in which it used". [Trial Ex. 1 at 2:30-32 and 9:65-10:3; Trial Tr. 42:16 - 43:9].

15. The interchangeability of these terms is consistent with how Hunter Douglas treated these terms in related patent applications. For example, in an amendment submitted to the U.S. Patent and Trademark Office in connection with the prosecution of

the parent application, Hunter Douglas remarked that "some of the existing claims have been amended . . . to change the word 'cable' to 'cord' to make the terminology consistent with claim 20." [Trial Ex. 4 at 2; Trial Tr. 37:17 - 40:16]. Hunter Douglas further explained "the words 'cable' and 'cord' are used interchangeably in the field of blinds, so this change in terminology is not intended to change the scope of the claims." [Id.]

16.  Consistent with the disclosure of the '242 Patent and the statements of Hunter Douglas to the PTO, one of ordinary skill in the art understands that the terms "cord" and "cable" are used interchangeably in the field of window blinds.  [Trial Tr. 40:20 - 41:9 ("THE COURT: How would an ordinary person skilled in the art that's at issue here view those terms relationally? THE WITNESS: They're synonyms to each other. They're interchangeable") and 48:8-12 ("Q  Now, do you believe that a person of ordinary skill in the field of window blind components would understand that the tilt cords recited in Claim 12 refer to a component of the ladder tape 16 shown in figures 1 and 20 of your patent? A   Yes, I do."].

17.  The '242 Patent further teaches that the slats 14 are open in a double pitch configuration when each pair of adjacent slats (14t and 14b) "is stacked right up against each other" and that the large empty space between the pairs of adjacent slats is "approximately twice the standard distance, or double the pitch (dp) between slats of a conventional blind having evenly-spaced slats." [Trial Ex. 1 at 9:56 - 62; Trial Tr. 31:6 - 15 and 43:10 - 45:9].

18.  Claim 12 recites a blind for selectively covering an architectural opening, comprising: a head rail (12), a plurality of slats (14) suspended from the head rail, including a plurality of pairs of upper and lower adjacent slats (14t and 14b); first and

second ladder tapes (16af and 16ar and 16bf and 16br) extending downwardly from said head rail, each of said first and second ladder tapes including a front tilt cord (16af and 16bf) and a rear tilt cord (16ar, 16br), wherein the first ladder tape supports and is operatively connected to tilt the upper slats of each pair of upper and lower adjacent slats and the second ladder tape supports and is operatively connected to tilt the lower slats of each pair of upper and lower adjacent slats, each of said tilt cords having a first end; a tilt rod (28) in driving engagement with the first ends of the front and rear tilt cords of the first and second ladder tapes, wherein rotation of said tilt rod raises and lowers the front and rear tilt cords of the first and second ladder tapes to move the slats from a first position in which the upper and lower adjacent slats of each pair are stacked against each other in a double pitch open position (Fig. 20 "dp") to a second position in which the pairs of upper and lower slats are in a tilted closed position (Fig. 21). [Trial Ex. 1 and 83; Trial Tr. 45:10 - 49:14][3].

### III.  The Person of Ordinary Skill in the Art

19.  Mr. Fraser, as a named inventor of the '242 Patent and having worked in the industry for more than 25 years, is an expert in the field of window blinds and he is at least a person of ordinary skill in the art. [Trial Tr. 21:8 - 13, 21:21 - 25:1, and 40:8 - 16].

20.  Based on his education, work experience, and interactions with engineers in the window blind industry, Mr. Fraser capably testified as to how a person of ordinary skill in the art would understand the disclosure of the '242 Patent and its claims. [Id., see also Trial Tr. 40:20 - 41:9 and 48:8 - 49:14].

---

[3]  In referring to the various embodiments and geometries disclosed in the '242 Patent, Mr. Fraser used the word "methods" at trial when generally referring to the different methods for arranging the blind components that are disclosed when he stated that claim 12 covers methods. It is clear from the claim language that claim 12 is directed to an apparatus. [Trial Ex. 1 at 27:60 - 28:15].

## IV.   The Defendants Made, Sold, and Offered for
## Sale Doubleview Blinds In the  United States

21.   One window covering product produced by Waters Edge is called the Doubleview Blind. [Trial Exs. 67-70 and 71 at 11:4-8]. In some instances, the defendants use the term Broadview Blind to describe their Doubleview Blind. [Trial Ex. 71 at 88:4-9].  For convenience, this court will refer to both the Doubleview and Broadview Blind products as the "Doubleview Blind."

22.   The defendants obtained a license to use certain patents owned by Tony Lai.  [Trial Ex. 7].  Mr. Lai owned certain patents in the window blind field. The plaintiff sought to use the Lai patents as part of the Doubleview Blind product of the defendants. The license agreement was effective January 1, 2014.  The "Exploitation" section of the license explicitly states that the defendants "shall also have the right to conduct any litigation required to defend the Patent, including taking any action against Hunter Douglas." [Trial Ex. 7 at Section 1.3 (emphasis added) and  Trial Ex. 71 at 151:11 (noting agreement was executed even though agreement produced was not counter-executed by defendants)].

23.   Waters Edge lined up one if its largest distributors, Mel Bakalar at Glider Blinds, to resell its Doubleview Blinds [Trial Exs. 67-70 and 71 at 12:10-15, 14:6-8 and 17:16-22]. Mr. Bakalar was to be the sole distributor for the Doubleview Blind. [Trial Ex. 71 at 51:13-14 and 51:16-17].  Mr. Bakalar negotiated a Sales, Marketing, and Manufacturing Agreement with Great Lake and Waters Edge whereby Mr. Bakalar would receive a 10% commission for his sales of the Broadview Blind and a 5% commission on all Broadview Blinds sold by others "to acknowledge Mel Bakalar's contribution to the development of the Broad View Blind." [Trial Ex. 60].

24. The defendants promoted and marketed their Doubleview Blind at a trade show in January 2014. [Trial Ex. 71 at 64:22-65:5 and 70:15-17].

25. The defendants do not dispute that Waters Edge sold Doubleview Blind products. [Trial Exs. 54, 59, 61, and 67-70]. In 2014, the defendants began manufacturing and selling their Doubleview Blind. [Trial Exs. 67-70 and 71 at 17:13- 15, 25:21-24, 51:13-14 and 51:16-17]. Glider Blinds purchased 58 Doubleview Blinds. [Trial Exs. 59, 61, and 71 at 52:1-2].

26. The trade show and sales were enough for Hunter Douglas to discover that the manufacture and sale of the Doubleview Blind infringed its '242 Patent. On October 21, 2014, Hunter Douglas sent a letter to the defendants notifying them of their infringing activities. [Trial Ex. 10].

27. Mr. Malmstadt received a copy of the Hunter Douglas letter of October 21, 2014. He forwarded it on to his business partners, Messrs. Bakalar and Lai, two days later and stated that "[he did] not want to stop production on a product that has such a good beginning." [Trial Exs. 10-11 and 71 at 105:20-22, 106:20-25].

28. Even after Hunter Douglas filed its Complaint [#1] on January 15, 2015, Mr. Bakalar of Glider Blinds informed Mr. Lai, the supplier of Doubleview Blind components, that Glider Blinds wanted to keep selling the Doubleview Blind because he believed it could be a new trend in wood blinds. [Trial Ex. 71 at 128:20-23].

29. Having sold about $350,000 in all blind products in 2015, the defendants thought it was worthwhile to get approval to manufacture the Doubleview Blind to shore up the losses from their sales in 2014-2015. [Trial Ex. 71 at 32:19-21 and 129:9-16].

30. After receiving the Hunter Douglas letter, Mr. Malmstadt still wanted to sell the Doubleview Blind. [Trial Ex. 71 at 112:18-20]. The defendants continued to sell the

Doubleview Blind. [Trial Ex. 54 at 1-2 (Order Confirmation identifying the "Date Ordered: 01/09/2015" and "Likely Ship Date: 01/23/2015) and Trial Ex. 61 at 22 (Invoice identifying "Invoice date 01/29/2015").  The sole distributor for the defendants, Glider Blinds, continued to prepare to market and promote the Doubleview Blind at a January 2015 trade show in Las Vegas. [Trial Ex. 71 at 123:22 - 124:2].  A desire to keep selling the Doubleview Blind is one reason why the defendants continued to contest the lawsuit after it was filed. [Trial Ex. 71 at 112:21-23].

31.  The defendants were further aware of a June 2015 offer from Hunter Douglas that was essentially a walk-away settlement.  The defendants did not approve the conditions of no further sales of the Doubleview Blind and a $5,000 settlement payment. [Trial Ex. 71 at 112:18-113:12].

32.  Instead, the defendants wanted to continue to manufacture and sell their Doubleview Blind. [Trial Ex. 71 at 112:18-23].

33.  In maintaining the positions of the defendants during this litigation, Mr. Malmstadt never even really studied at the '242 Patent. [Trial Ex. 71 at 80:9-11]. As of February 2015 when Mr. Malmstadt was deposed as the corporate representative of the defendants, Mr. Malmstadt testified on behalf of the defendants that they did not understand the '242 Patent. [Trial Ex. 71 at 136:7-10].

34.  Apparently, the defendants never thought they needed to understand the '242 Patent.

### V.  The Doubleview Blind Infringes Each and Every Element of the Asserted  Claims

35.  Asserted claim 12 of the '242 Patent states:

12.  A blind for selectively covering an architectural opening, comprising:

a head rail;

a plurality of slats suspended from the head rail, including a plurality of pairs of upper and lower adjacent slats;

first and second ladder tapes extending downwardly from said head rail, each of said first and second ladder tapes including a front tilt cord and a rear tilt cord, wherein the first ladder tape supports and is operatively connected to tilt the upper slats of each pair of upper and lower adjacent slats and the second ladder tape supports and is operatively connected to tilt the lower slats of each pair of upper and lower adjacent slats, each of said tilt cords having a first end;

a tilt rod in driving engagement with the first ends of the front and rear tilt cords of the first and second ladder tapes, wherein rotation of said tilt rod raises and lowers the front and rear tilt cords of the first and second ladder tapes to move the slats from a first position in which the upper and lower adjacent slats of each pair are stacked against each other in a double pitch open position to a second position in which the pairs of upper and lower slats are in a tilted closed position.

[Trial Ex. 1 at 27:60 - 28:15].

36. Claims 13 - 15 and 17 recite limitations for a second position (claims 13 and 14), third position (claim 14), slat spacings (claim 15), and the first ends of the ladder tapes (claim 17). [Trial Ex. 1 at 28:16 - 32 and 28:39 - 43].

37. The limited non-infringement arguments of the defendants for these claims are that (1)  their Doubleview Blind does not have first and second ladder tapes including a front and rear tilt cord, and (2) the one-piece cam and drum of the Doubleview Blind somehow falls outside the claimed device.

### A.  "a head rail", "a plurality of slats", "a plurality of pairs of upper and lower adjacent slats" (claim 12)

38. The Doubleview Blind of the defendants is a blind for selectively covering an architectural opening and it has a headrail, a plurality of slats that are suspended from the head rail, and the plurality of slats include a plurality of upper and lower adjacent slats. [Trial Tr. 51:21 - 52:10; Trial Ex. 1 at 27:60 - 64, Trial Ex. 55 at 1 - 4, Trial Ex. 56

at 2, 10 - 11, Trial Ex. 57, Trial Ex. 81, and Trial Ex. 83 at 25 - 27].

## B. "first and second ladder tapes", "front tilt cord", "rear tilt cord", "tilt cords having a first end" (claim 12)

39.   The Doubleview Blind of the defendants has first and second ladder tapes extending downwardly from said head rail, and each of the first and second ladder tapes have a front tilt cord and a rear tilt cord. [Trial Tr. 52:11 - 54:12 and 55:15 - 24; Trial Ex. 1 at 27:65 - 28:6, Trial Ex. 56 at 10 - 12, Trial Ex. 81, and Trial Ex. 83 at 28 - 31].

40.   Moreover, the first ladder tape supports and is operatively connected to tilt the upper slats of each pair of upper and lower adjacent slats and the second ladder tape supports and is operatively connected to tilt the lower slats of each pair of upper and lower adjacent slats. [Trial Tr. 54:13 - 55:14; Trial Ex. 1 at 27:65 - 28:6, Trial Ex. 56 at 10 - 12, Trial Ex. 81, and Trial Ex. 83 at 28 - 31].

41.   Although Figure 1 of the '242 Patent depicts the tilt cords 24 separate from the ladder tapes 16, one of ordinary skill in the field of blinds would readily recognize that the claim term "tilt cords" refers to the front and rear tilt cables of each ladder tape. [Trial Tr. 30:3 - 11, 39:22 - 24, 40:20 - 41:9, 42:16 - 43:4, and 43:5 - 9; Trial Ex. 1 at Fig. 20].

42.   One of ordinary skill in the field of blinds would further readily recognize and know that the tilt cords recited in claim 12 refer to components of the ladder tapes-namely, the components shown as 16af and 16ar (front and rear tilt cords of the first ladder tape) and 16bf and 16br (front and rear tilt cords of the second ladder tape). [Trial Tr. 46:9 - 47:8 and 47:9 - 25 ("Q But you're testifying that the tilt cords recited in claim 12 refer to item 16 in figures 1 and 20?  A Yes. . . . Q  Does claim 12 state what the tilt cords are part of? A Yes. Q What are they part of? A First and second ladder

14

tapes."); Trial Ex. 1 at Figure 20].

43.  Also, each of the tilt cords has a first end. [Trial Tr. 55:15 - 24; Trial Ex. 1 at 27:65 - 28:6, Trial Ex. 56 at 10 - 12, Trial Ex. 81, and Trial Ex. 83 at 28 - 31].

### C.  "tilt rod" and "double pitch open position"  and "tilted closed position" (claim 12)

44.  The Doubleview Blind of the defendants has a tilt rod in driving engagement with the first ends of the front and rear tilt cords of the first and second ladder tapes. [Trial Tr. 55:25 - 56:23; Trial Ex. 1 at 28:7 - 15, Trial Ex. 56 at 13 - 14, Trial Ex. 81, and Trial Ex.  83 at 32 - 34].

45.  The rotation of the tilt rod raises and lowers the front and rear tilt cords of the first and second ladder tapes to move the slats from a first position in which the upper and lower adjacent slats of each pair are stacked against each other in a double pitch open position to a second position in which the pairs of upper and lower slats are in a tilted closed position. [Trial Tr. 41:18 - 42:6 ("Q Is there any relationship between the drums and the tilt rods you talked about before? A The tilt rod actually rotates those drums causing the cable tapes to move.  Q What happens when you move the cable tapes? A The slats open and close depending on which direction you're turning the tilt rod in."), 46:21 - 47:8, 55:11 - 14, 55:25 - 56:23; Trial Ex. 1 at 28:7 - 15, Trial Ex. 56 at 1 - 2, 5 - 8 and 13 - 14, Trial Ex. 81, and Trial Ex. 83 at 32 - 34 and 39].

46.  One of ordinary skill in the art would readily understand that these tilt cables/cords are the only components described in the '242 Patent that can satisfy the limitations in claim 12 in that: (1) the tilt cables/cords are part of the ladder tapes; and (2) rotation of the tilt rod raises and lowers the front and rear tilt cords of the first and second ladder tapes. [Trial Tr. 39:22 - 24, 40:20 - 41:9, 42:16 - 43:4, and 43:5 - 9]. As

such, one of ordinary skill in the field of blinds would further readily understand that the claimed ladder tapes and claimed rotation of the tilt rod to raise and lower the cords/cables could not be performed by the tilt cords 24 depicted in Figure 1 of the '242 Patent. [Trial Tr. 47:9 - 25 and 48:16 - 49:7; Trial Exs. 1 at Fig. 1, 81 and 83]. Moreover, the tilt cords 24 are used to operate a cord tilter, which is used to rotate the tilt rod. [Trial Exs. 1 at 5:42 - 43 and 83]. Thus, these tilt cords 24 are not raised and lowered by rotation of the tilt rod; rather, they are used to rotate the tilt rod. Finally, nowhere in the '242 Patent are the tilt cords 24 described as front and rear tilt cords. [See generally Trial Ex. 1; Trial Tr. 49:5 - 7 ("Q Does your patent describe these tilt cords 24 as part of the ladder tape? A  No, it does not.")].

47.   One of ordinary skill in the field of blinds could further readily confirm his/her understanding by referring to the specification of the '242 Patent which discloses that "cord" and "cable" "are sometimes used interchangeably in this specification" and that the '242 Patent "will sometimes refer to the tilt cables when we mean the entire associated ladder tape including both the front and rear tilt cables . . . and this usage will be obvious within the context in which it is used". [Trial Ex. 1 at 2:30-32 and 9:65-10:3; Trial Tr. 42:16 - 43:9, 47:9 - 25, 48:8 - 12]. One of ordinary skill in the field of blinds would find the usage of the term "cord" obvious within the context in which it is used in claim 12. [Id.].

48.   The defendants failed to offer any evidence to rebut the above Finding of Facts  46 and 47.

49.   The Doubleview Blind of the defendants meets all of the elements and limitations of claim 12. [Trial Tr. 50:5 - 51:16, 51:17 - 59:6 (walking through the various elements and/or limitations), 59:7 - 59:9 ("Q So your opinion is [Defendants' Doubleview

Blind] includes every limitation and every element of claim 12? A Yes."), and 65:1 - 9; Trial Exs. 81 and 83 at 25 - 34].

D. "wherein the second position comprises the paired<br>upper and lower slats tilted closed in a first direction<br>selected from the group of room side up and room side<br>down, with the slats overlapping to provide closure." (claim 13)

50. The Doubleview Blind of the defendants has a second position where the paired upper and lower slats are tilted closed in a first direction that is either room side up or room side down and the slats overlap to provide closure. [Trial Tr. 59:10 - 60:1; Trial Ex. 1 at 28:16 - 20, Trial Exs. 56 at 5 - 6, 81, and 83 at 35].

51. The Doubleview Blind of the defendants meets all of the elements and limitations of claim 13. [Trial Tr. 59:10 - 60:1 and 63:7 - 18; Trial Exs. 81 and 83 at 35].

E. "wherein rotation of the tilt rod to raise and lower<br>the tilt cords also moves the slats to a third position in<br>which the paired upper and lower slats are tilted closed<br>in a second direction which is opposite the first direction,<br>with the slats overlapping to provide closure." (claim 14)

52. When the tilt rod of the Doubleview Blind of the defendants is rotated to raise and lower the tilt cords, it also moves the slats to a third position in which the paired upper and lower slats are tilted closed in a second direction that is opposite the first direction and the slats overlap to provide closure.  [Trial Tr. 60:2 - 61:18; Trial Ex. 1 at 28:21 - 26, Trial Ex. 56 at 9, Trial Ex. 81, and 83 at 36].

53. The Doubleview Blind of the defendants meets all of the elements and limitations of claim 14. [Trial Tr. 61:2 - 61:18 and 63:19 - 64:4; Trial Exs. 81 and 83 at 36].

### F.  "wherein, in both of the tilted closed positions, the spacings between the front edges of the adjacent slats are equal, the spacings between the rear edges of the adjacent slats are equal, and the overlaps of the adjacent slats are equal along the length of the blind." (claim 15)

54.  In both the tilted closed positions of the Doubleview Blind of the defendants, the spacings between the front edges of the adjacent slats are equal, the spacings between the rear edges of the adjacent slats are equal, and the overlaps of the adjacent slats are equal along the length of the blind. [Trial Tr. 61:19 - 62:10; Trial Ex. 1 at 28:27 - 32, Trial Ex. 56 at 9, Trial Ex. 81, and 83 at 37].

55. The Doubleview Blind of the defendants meets all of the elements and limitations of claim 15. [Trial Tr. 61:19 - 62:10 and 64:5 - 13; Trial Exs. 81 and 83 at 37].

### G.  "wherein the first ends of said front and rear tilt cords of said first and second ladder tapes are secured to rotating drums driven by said tilt rod and wind onto and off of their respective rotating drums as the drums rotate." (claim 17**)**

56.  The first ends of the front and rear tilt cords of the first and second ladder tapes of the Doubleview Blind of the defendants are secured to rotating drums driven by the tilt rod and wind onto and off of their respective rotating drums as the drums rotate. [Trial Tr. 62:11 - 63:4; Trial Exs. 1 at 28:39 - 43, 56 at 13 - 14, 81, and 83 at 38].

57.  The Doubleview Blind of the defendants meets all of the elements and limitations of claim 17 [Trial Tr. 62:11 - 63:4 and 64:14 - 25; Trial Exs. 81 and 83 at 38].

## VI.  Aiding and Abetting

58.  By working with each other, with their distributor, and others to produce and sell the Doubleview Blind of the defendants, the defendants each actively and knowingly aided and abetted infringement of the '242 Patent by persons and entities other than the defendants.

## VII.  Invalidity

### A.  Written Description

59.  Evidence presented by Hunter Douglas establishes that the specification of the '242 Patent contains a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable one of ordinary skill in the art to make and use the inventions disclosed. [Trial Tr. 28:1 - 29:1 and 29:8 - 34:22; Trial Exs. 82 and 83 at 1 - 24]. Further, Mr. Fraser, being a person of ordinary skill in the art, testified that he would readily understand that the tilt cords that are part of the ladder tapes in claim 12 are named tilt cables in certain portions of the specification. [Trial Tr. 40:20 - 41:9 ("THE COURT: How would an ordinary person skilled in the art that's at issue here view those terms relationally? THE WITNESS: They're synonyms to each other. They're interchangeable"), 43:5 - 9, and 48:8 - 12 ("Q Now, do you believe that a person of ordinary skill in the field of window blind components would understand that the tilt cords recited in Claim 12 refer to a component of the ladder tape 16 shown in figures 1 and 20 of your patent? A  Yes, I do.").

60.  The defendants failed to offer any testimony or evidence from a person of ordinary skill in the art (or an expert witness knowledgeable with respect to how one of ordinary skill in the art would view the specification) who would not readily understand that the tilt cords that are part of the ladder tapes in claim 12 are named tilt cables in certain portions of the specification.  The defendants offered no evidence to rebut the testimony presented by Hunter Douglas concerning the written description.

### B.  Enablement

61. As shown by the illustrations below, the inventors fully, clearly, and meaningfully describe how to make and use their invention and have communicated the same through the written description and figures of the '242 Patent. It is very clear that the specification contains a written description of the invention, and the manner and process of making and using it, and that one of ordinary skill in the art is enabled to make and use the invention. [Trial Tr. 28:1 - 29:1, 29:8 - 34:22, 40:20 - 41:9, 43:5 - 9, and 48:8 - 12; Trial Exs. 1, 82, and 83 at 1 - 24].



FiG 1



FIG 20

62.  The defendants failed to offer any testimony on lack of enablement from a person of ordinary skill in the art (or an expert witness knowledgeable with respect to how one of ordinary skill in the art would view the specification) to rebut the testimony presented by Hunter Douglas to the contrary. The testimony presented by Hunter Douglas shows that the specification contains a written description of the invention, and the manner and process of making and using it, and that one of ordinary skill in the art is enabled to make and use the invention.

## CONCLUSIONS OF LAW

### I. Patent Infringement

63.  A patent infringement claim involves a two-step analysis. First, the court "must determine, as a matter of law, the correct scope and meaning of a disputed claim term." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1365 (Fed. Cir. 2002). Second, the properly construed patent claims must be compared to the accused device to see if that device contains all of the limitations of the claimed invention, which is a

question of fact. *Id.*, *see also Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). The accused device is the device that allegedly infringes the patent of the plaintiff. If the accused device contains all of the limitations of the patented invention, then the accused device infringes the patent.

64. The words of a claim are generally given their ordinary and customary meaning to a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 - 13 (Fed. Cir. 2005) (en banc).

65. To prove infringement, the patentee must show by a preponderance of the evidence that (1) each element and limitation of at least one of the claims of the patent is present in the accused device, either literally or under the doctrine of equivalents (see, e.g., *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1350 (Fed. Cir. 1999)); and (2) the defendants made, used, sold, offered for sale, or imported the accused device in the United States. 35 U.S.C. § 271(a).

66. Following a *Markman* hearing in this case, and after finding only two terms in contention, the court construed the terms "operatively connected" and "in driving engagement" to have their plain and ordinary meanings and found that no further construction was necessary. *Order* [#65], pp. 5, 10, and 12.

67. To the extent the defendants now request the court to construe the terms "front tilt cord" and "rear tilt cord", the court declines the invitation to do so. As the court determined in its **Order Construing Disputed Patent Claim Terms** [#65], the defendants failed to seek construction of these terms during claim construction. The defendants have waived or forfeited any arguments regarding the meaning of the term "tilt cord" by not raising the arguments earlier. See, e.g., *Cent. Admixture Pharmacy*

***Servs., Inc. v. Advanced Cardiac Sols., P.C.***, 482 F.3d 1347, 1356 (Fed. Cir. 2007) ("The district court found that [defendants] waived any argument with respect to this term by failing to raise it during the claim construction phase. We agree.").

68.   Having previously construed the terms at issue, the patent claims at issue have been compared to the Doubleview Blind (see above), this court concludes that the plaintiff has met its burden to show by a preponderance of the evidence that the Doubleview Blind contains all of the elements and limitations of the claims 12-15 and 17. [Trial Exs. 1, 56, 81, 82, 83 at 24 - 39; Trial Tr. 58:19 - 59:9 and 63:7 - 65:9]. The court need not consider willfulness in the context of enhanced damages because the plaintiff has not sought monetary damages. However, the court does consider the willful conduct of the defendants, among other factors, in the context of the request for a permanent injunction and attorney fees made by the plaintiff.

## II.  Permanent Injunction

69.   The defendants entered the market to compete directly with the double pitch blinds of Hunter Douglas.  The defendants have the contractual right to "tak[e] any action against Hunter Douglas" with regard to the patents licensed to the defendants by Tony Lai.  [Trial Ex. 7]. When parties are direct competitors, the infringement of the exclusive right granted by a patent poses the significant risk of irreparable injury and makes injunctive relief appropriate. See, e.g., ***Otter Prods., LLC v. FreeCo, Inc.***, No 10- cv-2028-LTB, 2011 WL 1542150 at *3 (D. Colo. Apr. 25, 2011) (finding irreparable harm where the infringing products were sold in direct competition and granting a permanent injunction); ***Fresenius Med. Care Holdings Inc. v. Baxter Int'l, Inc.***, No. C 03-1431, 2008 WL 928496 at *3 (N.D. Cal. Apr. 4, 2008) ("Courts routinely find irreparable harm, and therefore grant permanent injunctions where, as here, the

infringer and the patentee are direct competitors."); ***Novozymes A/S v. Genencor Int'l.***, 474 F. Supp. 2d 592, 613 (D. Del. 2007) (granting permanent injunction and noting that parties "are head-to-head competitors, and [the patentee] has a right, granted by Congress, not to assist its rival with the use of proprietary technology"); ***TiVo Inc. v. EchoStar Commc'n Corp.***, 446 F. Supp. 2d 664, 669-70 (E.D. Tex. 2006) ("Defendants compete directly with Plaintiff- Defendants . . . . The availability of the infringing products leads to loss of market share for Plaintiff's products. Loss of market share in this nascent market is a key consideration in finding that Plaintiff suffers irreparable harm . . . .").

70.  To be entitled to a permanent injunction, Hunter Douglas must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. See, e.g., ***Southwest Stainless, LP v. Sappington***, 582 F.3d 1176, 1191 (10th Cir. 2009).

71.  Hunter Douglas has met its burden to prove infringement by the defendants and, thus, has established actual success on the merits of its claim for patent infringement.

72.  Hunter Douglas will suffer irreparable harm if a permanent injunction is not issued.  The defendants have made, sold, and offered for sale their infringing products in direct competition with sales by Hunter Douglas of the type of blind detailed in the '242 Patent. [Trial Exs. 81 and 82; Trial Tr. 32:22 - 33:3].  The blind products of Hunter Douglas derive substantial value from their patented features. The wholesale infringement by the defendants of the intellectual property rights of Hunter Douglas diminishes this value by eroding the exclusivity of the functionality of the Hunter Douglas

blinds. The infringement by the defendants of the patent rights of Hunter Douglas has caused and will continue to threaten irreparable harm.

73. The requested injunction will not harm the defendants. The defendants do not have the right to make and sell a product that infringes the '242 patent. The threatened injury to Hunter Douglas of defendants continuing to manufacture and sell their infringing blind outweighs any conceivable injury to the defendants.

74. The public interest favors Hunter Douglas being able to enforce its patent against the infringing products of the defendants and to keep those infringing products out of the market.

75. A patentee cannot be compensated adequately by monetary damages when an infringer produces products covered by the asserted patent. *See Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985) ("The patent statute further provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money. If monetary relief were the sole relief afforded by the patent statute then injunctions would be unnecessary and infringers could become compulsory licensees for as long as the litigation lasts."). In such cases, monetary damages are not an adequate remedy against future infringement because "the principal value of a patent is its statutory right to exclude." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 397 F. Supp. 2d 537, 546 (D. Del. 2005) (quotation omitted).

76. In addition, "[t]he fact that the defendant has stopped infringing is generally not a reason for denying an injunction against future infringement unless the evidence is very persuasive that further infringement will not take place." *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1281 (Fed. Cir. 1988), abrogated on other

25

grounds by *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). "If the defendant be honest in his protestations an injunction will do him no harm; if he be dishonest, the court should place a strong hand upon him . . ." Id. (quoting *Gen. Elec. Co. v. New England Elec. Mfg. Co.*, 128 F. 738, 740 (2d Cir. 1904)).

77.   To the extent the defendants tried to argue at trial that they have voluntarily ceased their infringing activities, they put on no such evidence.  In his opening statement, counsel for the defendants stated just the opposite – that the "defendants proceeded to make and continue to make the accused device." [Trial Tr. 18:8 - 9]. However, statements of counsel in an opening statement are not evidence. Regardless, it has long been held that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000); *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953). The "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness." *W.T. Grant Co.*, 345 U.S. at 698. The defendants have not met this burden.  To the contrary, Mr. Malmstadt testified that it was easy to enter the market. [Trial Ex. 71 at 39:6 - 21 and 46:1 - 2]. Moreover, the defendants wished to keep manufacturing and selling the Doubleview Blind and, even after receiving notice of their infringement, continued their efforts to market and promote the Doubleview Blind. [Trial Exs. 7, 10, 11, 54, 60 - 61, 67 - 70, 81, and Trial Ex. 71 at 11:4 - 8, 12:10 - 15, 14:6 - 8, 17:13 - 22, 25:21 - 24, 55:13 - 14, 51:16 - 17, 64:22 - 65:5, 70:15 - 17, 80:9 - 11, 105:20 - 22, 106:20 - 25, 112:18 - 113:12, 113:21, 120:1 - 4, 128:20 - 34, 129:9 - 16].  The continued desire of the defendants to sell their infringing Doubleview product is further supported by the pursuit

26

by the defendants of their baseless counterclaims in this action.  In short, the defendants have provided no assurances that further infringement will not occur.

78.  All four factors here weigh in favor of Hunter Douglas and support the conclusion that Hunter Douglas has met its burden to show it is entitled to a permanent injunction.

### III.  Invalidity

79.  Every patent issued by the U.S. Patent and Trademark Office carries the presumption of validity.  35 U.S.C. § 282(a). Defendants bear the heavy burden of proving that the asserted claims are invalid by clear and convincing evidence. Microsoft Corp. v. i4i Ltd. P'ship, 131 S. Ct. 2238, 2243 (2011) (emphasis added).

80.  In the Final Pretrial Order, Defendants alleged that the asserted claims are invalid under 35 U.S.C. § 112, first paragraph (pre-AIA3), arguing that claim 12 recites a device with ladder tapes having front and rear tilt cords, but the written description does not show or describe such a device.

### A.  Written Description

81.  The applicable section of the Patent Act reads: "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. §112, first para. (pre-AIA[4]). Thus, this section contains three

---

[4]  Hunter Douglas refers to the pre-AIA versions of § 112 because  the application resulting in the '242 Patent was filed before the America Invents Act, Pub. L. No. 112-29 ("AIA") took effect on September 16, 2012.

separate requirements regarding the patent specification, namely, (1) written description; (2) enablement; and (3) best mode.

82.  The question of whether the subject matter of a patent claim fails to meet the written description requirement is a question of fact. ***Vas-Cath Inc. v. Mahurkar***, 935 F.2d 1555, 1563 (Fed. Cir. 1991). In order to comply with the written description requirement, the specification "need not describe the claimed subject matter in exactly the same terms as used in the claims; it must simply indicate to persons skilled in the art that as of the [filing] date the applicant has invented what is now claimed." ***Eiselstein v. Frank***, 52 F.3d 1035, 1038 (Fed. Cir. 1995). Importantly, the issue of compliance of the written description requirement is judged from the perspective of one of ordinary skill in the art. Vas-Cath, 935 F.2d at 1563 - 64.

83.  In order to satisfy the written description requirement, the specification does not have to provide in haec verba support for the claimed subject matter at issue. ***See Fujikawa v. Wattanasin***, 93 F.3d 1559, 1570 (Fed. Cir. 1996). That is, the failure of a patent specification to use the same language for an element of a claim is not fatal provided that one skilled in the art would recognize and understand the specification as showing what has been invented. ***See Eiselstein***, 52 F.3d at 1039. The written description may be satisfied by means of words and figures. ***See Enzo Biochem, Inc. v. Gen-Probe Inc.***, 285 F.3d 1013, 1021 (Fed. Cri. 2002).

84.  Importantly, the challenger bears the burden of proof on the question of compliance with the written description requirement by clear and convincing evidence. ***Enzo Biochem, Inc. v. Gen-Probe Inc.***, 323 F.3d 956, 962 (Fed. Cir. 2002).

85.  The defendants have failed to meet their burden. Hunter Douglas' '242

Patent is presumed valid. [Trial Ex. 1]. Evidence presented by Hunter Douglas establishes the specification of the '242 Patent contains a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable one of ordinary skill in the art to make and use the inventions disclosed. [Trial Tr. 28:1 - 29:1 and 29:8 - 34:22; Trial Exs. 82 and 83 at 1 - 24]. Hunter Douglas' evidence further establishes that one skilled in the art would recognize and understand the words and figures of the '242 Patent's specification as showing what has been invented. In particular, Mr. Fraser, being a person of ordinary skill in the art, testified that he would readily understand that the tilt cords that are part of the ladder tapes in claim 12 are named tilt cables in certain portions of the specification. [Trial Tr. 40:20 - 41:9, 43:5 - 9, and 48:8 - 12]. The defendants fail to offer any testimony to the contrary.

<u>B. Enablement</u>

86. For lack of enablement, "the burden of proof [is challenger's] alone." ***Cephalon, Inc. v. Watson Pharm., Inc.***, 707 F.3d 1330, 1337 (Fed. Cir. 2013). "Because we must presume a patent enabled, the challenger bears the burden, throughout the litigation, of proving lack of enablement by clear and convincing evidence." ***Id***. at 1337- 1338. Mere argument by defense counsel will not suffice to carry this burden. ***SunPower Corp. v. PanelClaw, Inc***., No. CV 12-1633-MPT, 2016 WL 1293479 (D. Del. Apr. 1, 2016). "[Defendant's] attorney argument in support of its contention that the claims do not meet the enablement and written description requirements . . . is insufficient to support its motion for summary judgment." ***Id***. at *11.

87. Determining enablement is a question of law based on underlying factual findings. ***In reVaeck***, 947 F.2d 488, 495, (Fed. Cir. 1991); ***Atlas Powder Co. v. E.I. du***

*Pont de Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984).

88.  The defendants cannot meet their burden and improperly seek to use their failure to seek a construction as a ground to invalidate the '242 Patent. The defendants initially identified 13 claim terms for which the defendants sought construction, including the proposed construction of the terms "front tilt cord" and "rear tilt cord" as "front tilt cables" and "rear tilt cables." [#35].  However, the defendants changed course and did not seek construction of "front tilt cord" or "rear tilt cord" in their opening brief [#42]. In its response [#48] to the opening brief of the defendants, Hunter Douglas contended that the defendants dropped any challenge to the claim terms not addressed and the defendants did not object to this contention in their reply [#56].  I concluded that "[t]he defendants do not seek construction of any other claim terms."  *Order* [#65], p. 5

89.  Contrary to the current position of the defendants, for which they offer no evidence, the evidence demonstrates that in 2015, when the defendants first proffered a construction, the defendants understood that the terms "cord" and "cable" were used interchangeably [#35 at 3] and that the '242 Patent contained a written description of the invention, and the manner and process of making and using it, and that one of ordinary skill in the art is enabled to make and use the invention. [Trial Tr. 28:1 - 29:1, 29:8 - 34:22; 40:20 - 41:9, 43:5 - 9, and 48:8 - 12; Trial Exs. 1, 82, and 83 at 1 - 24].

90.  The claim of the defendants that claim 12 contains an error because it uses the words "front tilt cord" and "rear tilt cord" instead of "front tilt cable" and "rear tilt cable" and that Hunter Douglas failed to correct this error flies in the face of the evidence.  The purported reliance by the defendants on *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371 (Fed. Cir. 2004) is misplaced.  As discussed above, the evidence shows, at least, that (1) the defendants themselves understood that the

terms "cord" and "cable" were interchangeable [#35]; (2) that the defendants failed to seek construction of these terms [#65 at 5]; (3) that the specification of the '242 Patent expressly discloses that the terms "cord" and "cable" are used interchangeably in the field of window blinds [Trial Ex. 1 at 2:30 - 32 and 9:65 - 10:3]; (4) that the prosecution history of the '242 Patent further demonstrates that these terms are used interchangeably [Trial Ex. 4 at 2]; and (5) that the use of the terms "cord" and "cable" in Claim 12 are still further consistent with how those terms are understood by Hunter Douglas and those of ordinary skill in the art [Trial Tr. 39:22 - 25, 40:20 - 41:9, 43:5 - 9, and 48:16 - 49:14]. Thus, not only is there no claim construction issue, the evidence shows there is no error in claim 12.

91. Accordingly, this court concludes that the asserted claims of the '242 Patent are not invalid.

## IV. Attorney Fees

92. In exceptional cases the court may award reasonable attorney fees to the prevailing party. 35 U.S.C. § 285. To recover an award of reasonable attorney fees and costs, Hunter Douglas has the burden of establishing by a preponderance of the evidence that this case is "exceptional" in that it "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Arrow Elecs., Inc. v. Arrow P'ship, LLC*, No. 15-CV-02370-RBJ, 2017 WL 713914, at *5 (D. Colo. Jan. 17, 2017) (citing *Octane Fitness, LLC v. Icon Health & Fitness*, 572 U.S. 545 (2014)).

93. "Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less a high one." *Octane Fitness*, 572 U.S. at 557. That is, a party seeking attorney fees under § 285 must prove the merits of their contentions by a preponderance of the evidence. *Id*.

94. "(E)ither subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Octane Fitness*, 572 U.S. at 555. Courts are to consider the totality of the circumstances in determining whether a case is exceptional. *Id*. at 550. Here, the totality of the circumstances demonstrates that this case is exceptional.

95. The defendants had no objectively reasonable basis to contend that their Doubleview Blind did not infringe the '242 Patent. The defendants did not make an effort to understand the patent they were accused of infringing, and their non-infringement claim is meritless. [Trial Ex. 71 at 80:9 - 11 and 136:7 - 10].

96. The defendants initially identified 13 claim terms that purportedly required construction [#35], and proposed that the terms "front tilt cord" and "rear tilt cord" be construed as "front tilt cables" and "rear tilt cables." [#35 at 3]. However, in their opening brief [#43], the defendants only sought construction of two terms and did not seek construction of "front tilt cord" or "rear tilt cord." Still, through trial, the defendants debated the meaning of "front tilt cord" or "rear tilt cord," as those terms are used in the '242 Patent. The shifting and baseless claim construction positions of the defendants resulted in unnecessary expenditure of legal fees by Hunter Douglas.

97. At trial, the defendants failed to put on any significant evidence to support their contention that the Doubleview Blind of the defendants did not infringe the '242 Patent. Their pursuit of their non-infringement claim is meritless and needlessly

32

protracted the litigation.

98.  The defendants also had no objectively reasonable basis to contend that the '242 Patent is invalid.  The invalidity claim of the defendants is legally untenable and meritless. The '242 patent discloses that "cord" and "cable" can be used interchangeably, is not lacking in written description, and is enabled. [Trial Ex. 1]. This is well known to those of skill in the art. [Trial Tr. 48:8 - 12].  The defendants knew this much in 2015 when they initially proffered a construction that used the terms interchangeably (that the terms "front tilt cord" and "rear tilt cord" be construed as "front tilt cables" and "rear tilt cables"). [#35 at 3].  The defendants nonetheless pursued their meritless claims through trial.

99.  These were not just tactical blunders. The defendants advanced baseless claims and positions, and pursued claims and defenses they knew or should have known to be meritless.  The defendants maintained their invalidity claim well after this claim had been shown by their own proffered interpretation to be without merit.  The defendants asserted defenses they and their attorneys knew to be meritless.  The defendants repeatedly failed to introduce admissible evidence of invalidity or non-infringement.  Apparently, the overall strategy of the defendants in this litigation was to force Hunter Douglas to expend large amounts of money in a lengthy and protracted litigation.

100.  It is no defense that counsel is a solo practitioner. Attorney fees can be awarded even against pro se plaintiffs when that plaintiff should have known his claims were unreasonable. *Yufa v. TSI Inc.*, 2014 U.S. Dist. LEXIS 113148 (N.D. Cal. 2014) unreasonable).

101. Continued pursuit by the defendants of meritless claims for invalidity and non-infringement supports a finding that this case is exceptional; thus, warranting an award of reasonable attorney fees to Hunter Douglas. For almost 100 years, window blinds and coverings have been the main business asset of Hunter Douglas, which Hunter Douglas protects with patents, including the '242 Patent. In contrast, the Doubleview Blind products represent a minute portion of the costs and profits of the defendants. Thus, there must be some recourse for Hunter Douglas, and to plaintiffs in a similar position to Hunter Douglas, who must come to court to stop their competitors from selling infringing products. Although the claims of Hunter Douglas may be of small monetary value, the claims are vital to the survival of their businesses and competitive market position.

102. After considering the totality of the circumstances, the court concludes that Hunter Douglas has met it burden in proving that this case is exceptional. Thus, Hunter Douglas is entitled to an award reasonable attorney fees under 35 U.S.C. § 285.

## ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. That judgment shall enter in favor of the plaintiff, Hunter Douglas Inc., and against the defendants, Great Lake Woods, Inc. and Waters Edge Blinds and Window Treatments, LLC, on the claims of the plaintiff for direct patent infringement and active inducement of patent infringement;

2. That judgment shall enter in favor of the plaintiff, Hunter Douglas Inc., and against the defendants, Great Lake Woods, Inc. and Waters Edge Blinds and Window Treatments, LLC, on all counterclaims asserted by the defendants;

3. That the defendants, Great Lake Woods, Inc. and Waters Edge Blinds and

Window Treatments, LLC, and each of their members, officers, directors, agents, servants, employees, attorneys-in-fact, subsidiaries, affiliates, predecessors, successors, assigns and/or other related companies, and persons in active concert or participation with any one of them who receive actual notice of this Permanent Injunction by personal service or otherwise, are hereby permanently enjoined and restrained from making, having made, using, offering for sale, or selling in the United States the infringing Doubleview Blind, or products that are merely a colorable imitation thereof, and/or assisting, aiding, or abetting another person or business entity in engaging or performing any of the foregoing activities, for the remaining term of the Patent in Suit;

4. That under 35 U.S.C. 285, the plaintiff, Hunter Douglas Inc., shall be awarded its reasonable attorney fees if the plaintiff files a timely motion for an award of attorney fees under Fed. R. Civ. P. 54(d)(2), and in that motion properly circumstantiates a claim for reasonable attorney fees; and

5. That under Fed. R. Civ. P. 54(d)(1), the plaintiff, Hunter Douglas Inc., is awarded its costs, to be taxed by the clerk the time and manner prescribed by Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

Dated March 27, 2019, at Denver, Colorado.

BY THE COURT:

Robert E. Blackburn
United States District Judge